

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ROBERT W. SENSKE, )
)
        Plaintiff, )  No. 07 C 2451
)
    v. )
)  Honorable Charles R. Norgle
SYBASE, INC. )
)
        Defendant. )

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court is the Defendant Sybase, Inc.'s ("Sybase") motion for summary

judgment against Plaintiff Robert W. Senske ("Senske"), who alleges that Sybase, his former

employer, discriminated against him because of his age in violation of the Age Discrimination in

Employment Act ("ADEA") (Count I) and, in conjunction, subjected him to an intentional

infliction of emotional distress (Count II). For the following reasons, the motion is granted as to

Count I. The Court otherwise relinquishes jurisdiction as to Count II, Senske's state law claim

for intentional infliction of emotional distress.

## I. BACKGROUND

### A. FACTS

Unless the Court indicates otherwise, the following facts are undisputed. Sybase is in the

business of developing and managing software and "database technology" for businesses world-

wide. Sybase first hired Senske in April 2002 to serve as a Product and Sales Service

Representative in the Western Region for Sybase North America. At the time, Senske was 55

years old. Later that year, in June or July 2002, Sybase laid off Senske for what he calls "a

general cutback" in the company's sales force. Senske Dep. at 158. Despite the cutback, Sybase rehired Senske in September 2002, this time to serve in a more senior position than before. His new title was Strategic Account Manager 2, or "SAM," for the Western Region. Senske was still 55 years old.

Senske served as Sybase's only SAM 2 in the Western Region, although he worked along side several account managers, territory account managers and one SAM 3. According to Sybase Vice Presidents Allan Roeder ("Roeder") and Barbara Stinnett ("Stinnett"), SAMs were considered senior level employees responsible for maintaining Sybase's customer relationships within their assigned regions. SAMs, in essence, functioned as the company's "unified face" for the customer and were responsible ultimately for "orchestrat[ing] resources within Sybase to serve the customer." Stinnet Dep. at 110; Roeder Dep. at 290. Senske asserts, however, that he and his co-workers in lower positions had identical duties, and that Sybase supervisors held them to the exact same standards, though the record offers little support for this contention. In fact, some of the deposition testimony to which Senske cites in support of his contention states just the opposite – that there is a clear distinction between an account manager and a SAM. See Jones Dep. at 18. Another of Senske's deponents, who held a different title altogether, merely speculated that Senske and his co-workers had identical duties. See McNeely Dep. at 62. Nevertheless, without mincing Senske's precise duties, both parties understood the position to require Senske in the very least to take charge of deals, to maintain customer contact, to manage accounts, to provide forecasting reports to management, to maintain "funnel" or "pipeline" objectives and to meet the company's revenue goals.

To track performance, Sybase required its employees to undergo an annual performance review, or "Focal Review," at the beginning of each year. These reviews were coordinated by

2

immediate supervisors. Using the Focal Review, each supervisor graded the employee on how well he or she met the previous year's goals and, based on a number of factors, made an overall evaluation. Using a rating scale of 1 through 5, the supervisor assigned a number that indicated the performance rating each employee deserved. For example, a "4" rating meant that the employee was performing at a "marginal" level and needed improvement, while a "3" rating indicated that the employee's performance was "good." A "1" rating was the highest possible rating an employee could receive, while a "5" rating was the lowest.

In 2003 Terry Stempel ("Stempel") supervised Senske and prepared his Focal Review for that year. See Ex. H, Senske Dep. There Stempel noted that Senske was on track to meet his revenue goals, but that Senske failed to "build and maintain a qualified license pipeline" of three times his annual quota, which was one of Senske's goals for 2003. Id. at 2. Stempel also noted that Senske did not prospect well in 2003 and that he needed to increase his business prospects to meet his 2004 goals. Id. According to the review, Senske also failed to regularly update various forms, although Stempel praised Senske for updating his close plans on a weekly basis and for "closing a significant add on opportunity." Id. In the overall evaluation statement, Stempel wrote that Senske's sales performance was "unacceptable" and that his pipeline was insufficient. Id. at 3. Senske received a "4" as his final performance rating, which, again, indicated that he was performing at a marginal level and needed improvement. Id. at 4.

With respect to Senske's clients, in 2003 he led a significant effort to sell Sybase products and services to Bank One. In line with his efforts Senske met with Bank One decision-makers Frank Cerwin, Mike Frish and others to discuss various sales opportunities with the company. In the end, the talks were unsuccessful. Then, at some point in 2004, Senske learned that JP Morgan and Bank One were poised to merge. In May 2004, just before the merger,

Sybase began dealing directly with JP Morgan's decision-makers in New York, and thus another Sybase account manager, Dave Berry, took over the lead of the JP Morgan/Bank One account. While Dave Berry dealt with JP Morgan in New York, Senske maintained the relationships he forged with Bank One in Chicago. Senske admits that his Bank One contacts were not JP Morgan decision-makers, although Senske claims that they were "chief recommender[s]" with respect to the company's software needs. Senske Dep. at 186. Dave Berry closed the JP Morgan/Bank One deal in December 2004. Accordingly, he and Senske each received 50% of the commissions earned on the JP Morgan/Bank One account.

Meanwhile, in October 2004, Sybase's Allan Roeder ("Roeder") replaced Stempel as the Area Vice President for the Western Region and, in turn, became Senske's immediate supervisor. At the time, Senske was working on a deal involving HSBC, an existing Sybase account commonly known as "Household." HSBC was one of Sybase's "Global Accounts" for which the company assigned a Global Account Representative to oversee any pending or prospective deals. To move the deal forward, Senske maintains that he organized various planning sessions with HSBC and spoke with HSBC managers about new products and solutions that Sybase offered. Yet, Sybase contends that Senske actually failed to organize meetings with HSBC management, although it was his responsibility to do so. The parties also diverge as to who, exactly, closed the Sybase/HSBC deal in late 2004. Sybase avers that Roeder and another account manager, Mehul Rajparia ("Rajparia"), closed the deal themselves, while Senske says that he personally closed the deal, and that Roeder and Rajparia were only involved on a limited basis to grant discounts and other benefits that Senske was not authorized to grant. Either way, once the deal closed the parties do not dispute the following divide of commissions: Senske

received 90% of the commissions on the HSBC deal; the Global Account Representative received 10%; and Roeder and Rajparia received nothing.

In early 2005 Roeder prepared Senske's 2004 Focal Review. See Ex. I, Senske Dep. In the 2004 review Roeder acknowledged that Senske achieved 189% of his sales quota as a result of the HSBC and the JP Morgan closings. Id. at 1. However, Roeder commented that Senske "needed to focus on the paperwork associated with the position" and that Senske was routinely late in completing weekly reports and close plans. Id. at 2. Roeder also noted, although Senske disagrees with the accuracy of this assessment, that Senske's sales pipeline did not meet corporate guidelines. Id.; but see McNeely Dep. at 78. As to Senske's overall evaluation, Roeder stated that Senske could "be a top producer" and that he had "great contacts" with various Sybase personnel. Roeder urged that Senske work on his portfolio, as well as his negotiation and time management skills. Ex. I, Senske Dep. at 2. Roeder gave Senske an overall performance rating of "3," which indicates that he was performing consistently during the year and that he was "meeting all, and possibly exceeding some, performance requirements of the job and [was] a valuable member of his or her team." Id. at 3. Prior to the review, Roeder had supervised Senske for approximately 2 months.

Aside from Senske's performance review, Roeder and others complained often about Senske's time management skills. In November 2004 Senske, who had not personally met Roeder, volunteered to pick up Roeder at the airport. As it turned out, Senske was late. He arrived at the airport either one half hour late or two hours late, depending on which party recounts the incident. On another occasion, Senske and Roeder scheduled a meeting with a client in Milwaukee for which Senske agreed to drive. Once again Senske was late in picking up Roeder and, as a result, he was forced to "drive fast" to get them to the meeting on time. See

5

Senske Dep. at 230. In May 2005 Senske arrived late to a breakfast meeting, which prompted Roeder to write an email to Senske, explaining that Senske needed to improve his time management skills, as he seemed "to always be running late." Ex. M., Senske Dep. In the same email, Roeder reminded Senske that "[i]t's a lack of professionalism to always be late, it sends the wrong signal[.]" Id. Barbara Stinnet also testified that Senske was "so frequently late" to meetings and that he had "quite a few no-shows" followed by assurances that he would "follow-up" later, though he never did. Stinnet Dep. at 37-38.

In March 2005 Sybase placed Senske on a Performance Improvement Plan ("PIP") effective April 1 to May 31, 2005. See Ex. J., Senske Dep. The stated purpose of the PIP was to assist Senske in improving the skills necessary to perform satisfactorily at the SAM 2 level. Roeder, the PIP's author, indicated that Senske required improvement in four main areas. Specifically, Senske needed to improve his various management strategies, especially with respect to two Sybase clients – "Household" and "Citadel." Roeder urged Senske to be mindful of the new leadership style of Citadel decision-maker, Matt Swann ("Swann"), who previously expressed concern about Sybase's price quotes and about Sybase's failure to create a master price schedule from which Citadel could purchase Sybase products. Moreover, Roeder informed Senske in the PIP that he needed to be more responsive to Roeder's requests and that he needed to improve the timeliness and accuracy of his reporting. Roeder reminded Senske that the PIP was a serious matter that required immediate action. In the end, Roeder made it clear that, while he would monitor Senske's progress during the term of the PIP, the ultimate burden fell on Senske to successfully complete the plan.

On June 8, 2005 Roeder received an email from Swann at Citadel, which expressed a general disapproval of Sybase's service on the Citadel account. See Ex. O, Senske Dep. In the

message, Swann shared his concerns that, although he had been working closely with Sybase, "[w]ithout the appropriate team and level of commitment [the two companies] will be continually challenged in [their] efforts to do business." Id. In support, Swann conveyed that he had "very limited confidence that Bob Senske ... [is] capable of providing the level of support required by Citadel." Id. He explained that Sybase, with Senske at the helm, failed repeatedly in its attempts to deliver solutions to Citadel's fundamental problems. See id. Moreover, Swann made it clear that he did not believe "the structure [was] in place for [the two companies] to be truly successful." Id. As a result, Swann informed Roeder that Citadel would be evaluating other technologies to suit its needs. He concluded by saying, "It is my hope that you can help to rationalize these issues and make any appropriate changes so that we can further our partnership and business relationship. I would not anticipate any future business transactions until we can get back above water meeting minimum expectations." Id.

The next day, on June 9, 2005, Stinnet received an email from Sybase's Eric Johnson ("Johnson"), Vice President Financial Services, North America, regarding Senske's conduct on the HSBC account. See Ex. N, Senske Dep. The problem, Johnson noted, was that pursuant to the parties' agreement Senske's jurisdiction on the HSBC account was limited to "the Chicago city limits only." Id. But, nevertheless, Johnson explained that Senske "refuse[d] to work with Dave Berry, the North American HSBC Account Manager and [was] attempting to do deals elsewhere in the country." Id. Moreover, Johnson stated that Senske was communicating directly with Steve Jennings, Sybase's Global Account Manager for HSBC, in what seemed to be an effort to circumvent Dave Berry. Johnson concluded by saying, "This cannot continue. Besides being counterproductive, it is just wrong." Id. In response, Stinnet forwarded Johnson's message to Roeder, requesting that he work with Senske to resolve these issues.

On June 14, 2005 Roeder wrote a memorandum to Vice Presidents Andy Fox and Stinnet that summarized Senske's performance with respect to his PIP. See Ex. P., Senske Dep. Roeder explained that the issues at Citadel illustrated that Senske failed to deal proactively with his clients' outstanding problems and that Citadel, in particular, felt "miss-managed [sic]." Id. He noted again how just a few days before Johnson indicated to Stinnet that Senske was not returning Dave Berry's phone calls and was not perceived to be a team player. Id. On this point Roeder explained that "Bob always has excuses versus just accomplishing the task." Id. As to Senske's ability to respond to management's requests, Roeder indicated that Senske needed to improve his tardiness, stating, "Bob has been late for every meeting I have participated in with him." Id. Roeder further explained that Senske was generally late in providing weekly updates on the status of his account transactions and that his "lack of strategic planning forc[ed] his management team to get his deals across the finish line, [which] was evident in Q4 2004 w/ Household and again in Q2 2005 with Citadel." Id. Lastly, Roeder recounted Citadel's concerns with regard to Senske. In doing so, Roeder summarized Swann's email, which explained that he had limited confidence in Senske's ability to handle the Citadel account. Id. Roeder concluded by saying, "As the account manager for Citadel, Bob is responsible for meeting the customer's expectations. Therefore, based on Bob's performance during the plan and the complaint from Citadel, I recommend terminating Bob's employment with Sybase." Id. Thereafter, Sybase terminated Senske once his supervisors obtained approval from Stinnet's manager and from Sybase's Vice President of Worldwide Human Resources.

## B. PROCEDURAL HISTORY

Senske first took his claims to the Equal Employment Opportunity Commission, which issued a Notice of Right to Sue letter on February 13, 2007. Senske next filed his complaint in

this Court on May 2, 2007, seeking relief under the ADEA and state law. Sybase answered the complaint on June 8, 2007, denying generally the allegations in support of Senske's claims. Sybase filed a motion for summary judgment, which is fully briefed and before the Court.

The Court acknowledges, however, that on August 8, 2008 Sybase additionally moved to strike Senske's reply to Sybase's Rule 56.1(b)(3) response in light of its various objections to the Affidavit of Robert R. Senske ("Senske Affidavit"), which Senske submitted after his deposition and after Sybase filed its reply in support of its motion for summary judgment. On September 30, 2008 the Court denied Sybase's motion to strike, explaining that it would "give appropriate weight to the materials submitted, and shall disregard all affidavits and exhibits, or any portions thereof, that, as the Court determines, do not comply with Rule 56(e) or the Federal Rules of Evidence." See Dist. Ct. Order of September 30, 2008.

In line with this Order, the Court when deciding this motion shall disregard those paragraphs and exhibits of the Senske Affidavit that lack a proper foundation, constitute hearsay or represent irrelevant matter. See Tibbetts v. RadioShack, Corp., No., 03 C 2249, 2004 WL 2203418, at *14 (N.D. Ill. Sept. 29, 2004) (disregarding paragraphs in a declaration that did not comply with procedural or evidentiary rules); Custom Cartage, Inc. v. Motorola, Inc., No. 98 C 5182, 1999 WL 965686, at *4 (N.D. Ill. Oct. 15, 1999) (disregarding portions of an affidavit that were not based on personal knowledge). The Court shall also disregard those paragraphs in the Senske Affidavit that contradict Senske's previous deposition testimony. Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995); Darnell v. Target Stores, 16 F.3d 174, 176 (7th Cir. 1994) ("Inherently depositions carry an increased level of reliability. Depositions are adversarial in nature and provide the opportunity for direct and cross-examination."); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1297 (7th Cir. 1993).

9

## II. DISCUSSION

### A. STANDARD OF DECISION

Summary judgment is proper when there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, and where the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." Sides v. City of Champaign, 496 F.3d 820, 826 (7th Cir. 2007) (quoting Brummett v. Sinclair Broad. Group, Inc., 414 F.3d 686, 692 (7th Cir. 2005)). In determining whether a genuine issue of material fact exists, all facts are construed in favor of the nonmoving party, who, in this case, is the Plaintiff Senske. See Squibb v. Mem'l Med. Ctr., 497 F.3d 775, 780 (7th Cir. 2007). But the court's favor toward the nonmoving party does not relieve that party of the obligation to "do more than simply show that there is some metaphysical doubt as to the material facts." Waukesha Foundry, Inc. v. Indus. Eng'g, Inc., 91 F.3d 1002, 1007 (7th Cir. 1996) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Once the moving party has met its burden, the nonmoving party may not then rest on mere allegations to support its position, but instead "[t]o successfully oppose a motion for summary judgment, the nonmoving party must come forward with specific facts demonstrating that there is a genuine issue for trial." Trask-Morton v. Motel 6 Operating L.P., 534 F.3d 672, 677 (7th Cir. 2008). In other words, summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince the trier of fact to accept its version of the events." Steen v. Meyers, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005)). Further, "[i]t is not

the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." Harney v. Speedway SuperAmerica, LLC, 526 F.3d 1099, 1104 (7th Cir. 2008) (citing Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996)).

We note that the mere existence of some alleged or possible factual dispute will not defeat an otherwise properly supported motion for summary judgment, as speculation will not suffice. Amadio v. Ford Motor Co., 238 F.3d 919, 927 (7th Cir. 2001); see also Borcky v. Maytag Corp., 248 F.3d 691, 695 (7th Cir. 2001). "Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors," and discrimination law would be unmanageable if disgruntled employees could defeat summary judgment on mere speculations about the defendant's motives. See Rand v. CF Indus., Inc., 42 F.3d 1139, 1146 (7th Cir. 1994) (quoting Visser v. Packer Eng'g Assoc., Inc., 924 F.2d 655, 659 (7th Cir. 1991)). With these standards in mind, we determine whether Senske's claims, based on the evidence, can withstand summary judgment.

## B. DISCRIMINATION UNDER THE ADEA

The ADEA makes it unlawful for an employer to discharge an employee because of age when the employee is over forty years old. See 29 U.S.C. §§ 623(a)(1), 631(a). To establish a claim under the ADEA, Senske would have to show that his age "actually motivated" Sybase's decision to terminate his employment. Faas v. Sears, Roebuck & Co., 532 F.3d 633, 641 (7th Cir. 2008) (citing Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 489 (7th Cir. 2007)). Put another way, Senske must show that his age played an active role in Sybase's decision-making process and had a determinative influence on the outcome. Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000)).

11

Senske can establish an ADEA claim through either the direct or indirect methods of proof. Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 695 (7th Cir. 2006). But Senske failed to present any direct evidence of discrimination on account of his age, thus he must proceed under the familiar, indirect burden-shifting method. This method requires that plaintiffs first establish a prima facie case of discrimination. McDonnell Douglas v. Green, 411 U.S. 792, 93 (1973); Bahl v. Royal Indem. Co., 115 F.3d 1283, 1290 (7th Cir. 1997). If Senske can do so, this shifts the burden to Sybase to put forth a legitimate reason for its actions. Hong v. Children's Mem'l Hosp., 993 F.2d 1257, 1261 (7th Cir. 1993). From there, if Sybase satisfies its burden, the burden shifts back to Senske to show that Sybase's excuse was merely a pretext for discrimination. Id. The ultimate burden of persuasion, however, remains with Senske. Malacara v. City of Madison, 224 F.3d 727, 729 (7th Cir. 2000).

### 1. Prima Facie Case of Age Discrimination

Senske's first hurdle, as explained above, is to establish a prima facie case of discrimination on behalf of Sybase. To do so, Senske must proffer evidence that: (1) he belongs to a protected class; (2) his performance was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer sought someone to perform the same work after the terminated employee left the company. Pantoja v. Am. NTN Bearing Mfg. Corp., 495 F.3d 840, 846 (7th Cir. 2007) ("In a termination case, for example, an inflexible rule requiring plaintiff to point to a similarly situated comparator would automatically doom a suit brought by, for example, any employee who is the sole occupant of a particular job class at her employer.") (citing Matthews v. Allis-Chalmers, 769 F.2d 1215, 1217 (7th Cir. 1985)).

No one disputes that Senske, who was approximately 57 years old when he was terminated, is member of a protected class and that his termination constitutes an adverse

12

employment action. As such, Sybase does not contest that Senske has made a sufficient showing under the first and third prongs of his prima facie case. Rather, Sybase contends first that Senske cannot establish that he was "performing at a level that met Sybase's expectations," and second that Senske cannot point to a similarly-situated comparator that the company treated more favorably. The Court shall discuss each of these contentions in turn.

In support of its first argument, Sybase argues that Senske's supervisors counseled him on numerous occasions regarding his performance problems throughout 2003 and 2004. Specifically, his supervisors brought to his attention issues with respect to his timeliness, his failure to meet forecasting goals, his failure to meet "pipeline" goals, his failure to communicate with other account managers and his failure to provide timely and accurate reports. As it turned out, Senske's failure to comply with these directives came to a head in 2005, when Sybase decided to place Senske on a PIP. During this probationary period, according to Roeder's memorandum, Senske failed to improve his timeliness and otherwise failed to resolve the other issues regarding his performance. Sybase asserts that Senske's failure to comply with the PIP is substantiated by the significant issues that Senske was having on the Citadel account. These issues culminated to an email from the client to Roeder, explaining that the company had "limited confidence that Bob Senske . . . [is] capable of providing the level of support required by Citadel" and that it would be considering other vendors to assist the company with its software needs. Faced with this evidence, Sybase claims that a reasonable jury could not find that Senske was meeting the company's legitimate expectations.

In response Senske takes the opposing view and argues, despite Sybase's contentions, that he was in fact meeting the company's expectations. This is exemplified, says Senske, by his being one of the top sales people in the Western Region and his being selected as a member of

13

the President's Club, an honor through which Sybase recognizes its sales employees' outstanding work. In addition, Senske's deposition testimony reveals that he disagrees with Roeder's and others' complaints about his performance. For instance, Senske claims that he completed the required reports in a timely manner and that the issues with Citadel were not his responsibility. Senske, in essence, maintains that his own testimony is enough to establish a genuine issue as to whether he was performing satisfactorily and, in turn, meeting Sybase's legitimate expectations. Senske is right.

"A determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a prima facie case, may be based solely upon the employee's testimony concerning the quality of his work." Williams v. Williams Elecs., Inc., 856 F.2d 920, 923 (7th Cir. 1988) (citing Yarbrough v. Tower Oldsmobile, Inc., 789 F.2d 508, 512 (7th Cir. 1986)). Here, Senske testified that he was meeting Sybase's legitimate expectations. With that, there is little that Sybase can do to refute Senske's assertions at this point in the inquiry. This testimony, for prima facie purposes, is enough to create a genuine issue of material fact as to whether Senske was meeting the company's expectations. Williams, 856 F.2d at 923 n.6; Jain v. Int'l Truck & Engine Corp., No. 06 C 17-TS, 2007 WL 2904088, at *10 (N.D. Ind. Oct. 3, 2007) (finding that plaintiff satisfied his prima facie case using his own testimony in support of his claim that he was performing satisfactorily). This is not to say, however, that Senske's contradictory testimony would satisfy his burden to show pretext. Gustovich v. AT&T Commc'ns, Inc., 972 F.2d 845, 848 (7th Cir. 1992) ("Such statements may create a material dispute about the employee's ability but [they] do nothing to create a dispute about the employer's honesty – [they] do nothing, in other words, to establish that the proffered reason is a pretext for discrimination."). In fact, the employee's own

perception of his or her performance does not constitute affirmative evidence that can defeat a motion for summary judgment. Fortier v. Ameritech Mobile Commc'ns, Inc., 161 F.3d 1106, 1114 (7th Cir. 1998). This testimony is only sufficient to create a material dispute as to the second prong of his prima facie case, which Senske, accordingly, has satisfied.

As to Sybase's second argument, the company maintains that Senske cannot establish that he was treated less favorably than similarly situated employees outside his protected class. Def.'s Memo. at 13. This inquiry is of no consequence, however, since after the Seventh Circuit's decision in Pantoja, the focus in termination cases has shifted away from whether a plaintiff can point to a similarly-situated comparator to satisfy the fourth prong of the McDonnell Douglas test. 495 F.3d at 845-46. Notwithstanding this limitation, Senske contends in a round-about way that Sybase applied its legitimate expectations in a disparate manner. He says that Sybase treated its younger employers more favorably, and that his supervisors' own discriminatory views tainted their evaluation of his work performance.

Generally, when these arguments arise, the second and fourth prongs of the burden-shifting test merge, and the similarly-situated analysis comes into play for the benefit of plaintiff. See Pantoja, 495 F.3d at 846 (discussing the merger of prongs two and four, which allows the plaintiff to "stave off summary judgment" and proceed to the pretext inquiry). see also Grayson v. O'Neill, 308 F.3d 808, 818 (7th Cir. 2002) ("When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of McDonnell Douglas merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably."); Curry v. Menard, Inc., 270 F.3d 473, 477 (7th Cir. 2001). But what makes this case unique is that Senske has already established his prima facie case with respect to Sybase's

legitimate expectations. Thus there is no need to determine whether any similarly-situated comparators exist at this point in the inquiry.

To satisfy the fourth prong of his prima facie burden, Senske need only show that Sybase replaced him with a younger employee. Denisi v. Dominick's Finer Foods, Inc., 99 F.3d 860, 864 (7th Cir. 1996). And it is undisputed that Sybase did just that. When Senske left the company Sybase replaced him with Rob Eckert, who was 44 years old. Senske has satisfied the fourth and final prong of his prima facie case and survived summary judgment for the time being. We now proceed to the pretext inquiry.

## C. PRETEXT FOR DISCRIMINATION

Sybase contends that despite Senske's ability to meet his prima facie burden, it produced evidence of legitimate, non-discriminatory reasons for its decision to terminate his employment. These reasons were that: Senske continued to display problems with punctuality, attendance and responsiveness to his supervisors' requests; Senske failed to timely and accurately complete the required reports; Senske mismanaged Citadel, an important customer; and Senske failed to work as a team member on the HSBC account, which resulted in a complaint by Eric Johnson, a member of Sybase's senior management. The burden thus shifts back to Senske to demonstrate that these reasons are actually a pretext for the discharge because of his age.

### 1. Standards for Pretext

An employee demonstrates pretext directly by offering evidence that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's "ostensible justification is 'unworthy of credence.'" Testerman v. EDS Technical Prods. Corp., 98 F.3d 297, 302-03 (7th Cir. 1996) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). In doing so, a plaintiff must identify such weaknesses, implausibilities,

inconsistencies or contradictions in the employer's proffered reasons that a reasonable person could infer that the employer did not act for those reasons. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). The evidence must tend "to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." Testerman, 98 F.3d at 303 (citing Wolf v. Buss (America), Inc., 77 F.3d 914, 919 (7th Cir. 1996)).

Pretext, however, involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a "lie, specifically a phony reason for some action." Sublett v. John Wiley & Sons, Inc., 463, F.3d 731, 737 (7th Cir. 2006) (citations omitted). In assessing a plaintiff's claim that an employer's explanation is pretextual, the Court will not sit as a "'super personnel review board' that second-guesses an employer's facially legitimate business decisions." Culver v. Gorman, 416 F.3d 540, 547 (7th Cir. 2005). Rather, we ask only whether the employer's explanation was honestly believed. Id.; Grayson v. O'Neill, 308 F.3d 808, 820 (7th Cir. 2002) (explaining that the court is only concerned with "the issue of whether the employer honestly believes in the reasons it offers") (citing Wade v. Lerner New York, Inc., 243 F.3d 319, 323 (7th Cir. 2001)). In the end, a defendant is entitled to summary judgment if the company honestly believed in the nondiscriminatory reasons it offered, even if those reasons are foolish, trivial or even baseless. Hartley v. Wis. Bell, Inc., 124 F.3d 887, 890 (7th Cir. 1997); McCoy v. WGN Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992).

We note, finally, that the burden lies with the plaintiff to demonstrate that the employer's articulated reason for its actions was a mere pretext for discrimination. E.g., Velasco v. Ill. Dep't of Human Serv., 246 F.3d 1010, 1017 (7th Cir. 2001). And, if the employer offers a list of reasons for its actions, the employee must demonstrate that *each* proffered reason is pretextual,

see Wilson v. AM General Corp., 167 F.3d 1114, 1120 (7th Cir. 1999) (citing Russell, 51 F.3d at 69), unless, however, the case is one in which the "grounds offered by the defendant . . . are so intertwined, or the pretextual character of one of [the articulated reasons] is so fishy and suspicious," that plaintiff in the end prevails. Wilson, 167 F.3d at 1120 (citing Russell, 51 F.3d at 70). With these standards in mind, we turn to the parties' arguments.

### 2. Proffered Reasons As Pretext

As a preliminary matter, the Court is unconvinced at this point that a reasonable jury, considering all the evidence, would find that this case has anything to do with Senske's age. It is well-settled that the ADEA does not protect an employee against terminations based on reasons that may be empirically *correlated* with age, such as pension vesting or seniority. Hazen Paper v. Biggins, 507 U.S. 604, 609 (1993). Rather, for an ADEA claim to stand the decision to terminate the employee must be *motivated* by age. See Miller v. American Airlines, Inc., No. 03 C 7756, 2007 WL 489147, at *10 (N.D. Ill. Feb. 6, 2007). "In other words, 'proof of discriminatory motive is critical' in an ADEA action, and decisions based on factors other than age which may be correlated or associated with age are not unlawful." Id. (citing Biggins, 507 U.S. at 611 and EEOC v. Francis W. Parker Sch., 41 F.3d 1073 (7th Cir. 1994)).

In this case, Senske has not produced any evidence that supports a finding, even under the most liberal reading, that his termination was somehow motivated by his age. If anything the evidence shows that Sybase was motivated to hire Senske, on two different occasions, in spite of his age, given that he came to the company with several years of sales experience. Senske's one argument that connects his age to his termination is that Sybase did not treat its younger employees in a manner similar to Senske. But this indirect connection is unavailing, seeing that the younger employees with whom Senske compares himself were all over the age of 40 – the

18

cutoff age for individuals seeking protection under the ADEA – and held different positions. Moreover, Senske does not attempt to argue that any of his younger co-workers consistently arrived late to business meetings or mismanaged an account to the point that the client sends a disparaging e-mail to their supervisors.

Aside from that, it is plausible given the evidence that Sybase simply expected more from Senske. It is undisputed that Senske was hired directly into a position that required him to manage accounts, to take charge of deals and to maintain customer contact. If Senske failed in any one of these endeavors, Sybase would have a non-discriminatory reason, irrespective of age, to terminate his employment. See Jain, 2007 WL 2904088, at *10 (granting summary judgment on ADEA claim where plaintiff failed to tie the termination to plaintiff's age). According to Sybase, that is precisely what the company did.

Turning to the company's specific reasons, one of Sybase's strongest claims is that Senske dropped the ball with respect to the Citadel account. Indeed, the evidence shows that Roeder warned Senske that he would need to adapt to the new management style of Citadel's decision-maker, Matt Swann. In 2005 it became obvious that Senske failed to heed Roeder's advice, as Swann conveyed to Roeder his lack of confidence in Senske when dealing with Citadel's needs. Senske offers little to refute this evidence, except to say that it was not his responsibility to solve Citadel's "technical" issues.

The problem with Senske's argument is that it fails to show that Sybase's reason was phony. Even assuming that it was not Senske's responsibility to handle the client's technical problems, as he suggests, at best this argument shows that Sybase made a mistake in firing him. But this does not establish pretext, especially where the employee is faced with a complaint from a major client sent directly to the employee's supervisor. Senske needs to show more than a

19

mistake. He needs to show actual deceit, a cover-up or a lie. Cardoso v. Bosch Corp., 427 F.3d 429, 435 (7th Cir. 2005); Hague v. Thompson Dist. Co., 436 F.3d 816, 823 (7th Cir. 2006). This he cannot do. Senske failed to produce any evidence illustrating that Sybase's complaints about his performance on the Citadel account had anything to do with his age. And while Senske may perceive Sybase's decision as harsh, the propriety of its business decision is not an issue properly before the Court. See Petts v. Rockledge Furniture LLC, 534 F.3d 715, 724 (7th Cir. 2008) ("[W]e do not sit as a superpersonnel department with authority to correct an employer's decision that is unwise or unfair.") (quoting Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 697 (7th Cir. 2006)); Gordon v. United Airlines, Inc., 246 F.3d 878, 889 (7th Cir. 2001). Senske, then, has failed in his attempt to raise a genuine issue as to whether Sybase's legitimate reason was a mere pretext for age discrimination. Summary judgment is warranted for this reason alone.

Sybase also explained that it terminated Senske because of his problems with punctuality. In response, Senske argues that Sybase admitted in its response to the Illinois Department of Human Rights Questionnaire (the "Questionnaire") that "tardiness" was not a factor in the company's decision to terminate Senske, and thus now it cannot claim tardiness as a legitimate business reason for his termination. Senske, however, is mistaken.

Question A13 of the Questionnaire, which Senske cites in support of his argument, asked Sybase whether "attendance" was a factor in its decision to terminate Senske, not "tardiness" as he suggests. Ex. B, Aff. of Michael Sachs. For its answer, Sybase stated that this question was "[n]ot applicable." Id. Senske's argument fails because it conflates attendance with tardiness, when they are not one in the same. In those situations in which Senske arrived late, Sybase did not take issue with Senske's arrival, but with his time of arrival. In this way, Sybase was not inconsistent when it asserted Senske's tardiness in support of its decision to terminate his

employment. In short, the argument does not support a claim of pretext. Accordingly, since Senske failed to refute this reason as pretext, summary judgment is proper.

The Court need not walk through every legitimate reason that Sybase put forth in support of its motion for summary judgment. It is clear that Senske has failed in all respects to show that Sybase's reasons were a pretext for age discrimination. As the Court stated previously, a reasonable jury would be hard-pressed to find that this case has anything to do with age. Indeed the evidence so overwhelmingly supports Sybase's decision to terminate the plaintiff irrespective of his age, that what little self-serving evidence Senske put forth to show pretext does not create a genuine issue of material fact with regard to Sybase's reasons to terminate his employment. Summary judgment is therefore granted in favor of Sybase.

## D. PLAINTIFF'S STATE-LAW CLAIM

In Count II Senske alleges that because of Sybase's discriminatory conduct, the company and its agents subjected him to an intentional infliction of emotional distress. Count II is a pendant state-law claim that Senske otherwise would not have filed in federal court had it not been for his claim under the ADEA. And since summary judgment is granted as to Count I, a federal question is no longer before the Court. The Court therefore shall relinquish jurisdiction over Senske's state law claim for intentional infliction of emotional distress. See 28 U.S.C. § 1367(c)(3); Pugel v. Bd. of Trs. of the Univ. of Ill., 378 F.3d 659, 669 (7th Cir. 2004) ("The general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims....").

## III. CONCLUSION

For the reasons stated above, Defendant Sybase, Inc.'s motion for summary judgment against Plaintiff Robert W. Senske is granted as to Count I. The Court relinquishes jurisdiction as to Count II, Plaintiff's state law claim for intentional infliction of emotional distress.

IT IS SO ORDERED.

ENTER:

CHARLES R. NORGLE, Judge
United States District Court

DATED:    2-5-09